AO 106 (Rev. 04/10)  Application for a Search Warrant

HH

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
One gray Apple iPhone 11 obtained from Ralph Albert
Aldridge upon his arrest; and currently held at FBI Columbus
Office, Digital Evidence Storage, 425 W. Nationwide,
Columbus, Ohio

Case No.  2:20-mj-508

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1591/1594 | Conspiracy to obstruct enforcement of 18 U.S.C. 1591(a) |
| 18 U.S.C. 2232 | Destruction or removal of property to prevent authorized government seizure |
| 18 U.S.C. 1001(a) | making a false statement to law enforcement |
| 21 U.S.C. 841/846 | Possession with intent to distribute controlled substances and conspiracy to do so |

The application is based on these facts:

See attached affidavit incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael A. Harey, SA FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  7-20-20

_____
*Judge's signature*

City and state: Columbus, Ohio

Chelsey M. Vascura, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF: | ) | Case No. |
| Gray Apple iPhone 11 obtained from | ) | |
| Ralph Albert Aldridge upon his arrest on July 1, 2020 | ) | |
| and currently held at FBI Columbus Office, | ) | Magistrate Judge |
| Digital Evidence, 425 W. Nationwide, | ) | |
| Columbus, Ohio 43215 | ) | |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael A. Harey, Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state as follows:

### I.    EDUCATION TRAINING AND EXPERIENCE

1.      I am a Special Agent with the FBI assigned to the Cincinnati Division and I have been a Special Agent since October 2008, having worked on counterterrorism investigations and public corruption investigations as a Special Agent.  I am currently assigned to the FBI Child Exploitation Task Force, investigating matters involving the online exploitation of children and child pornography.  I have made arrests and have executed search warrants pertaining to these types of investigations.

2.      Prior to becoming a Special Agent with the FBI, I served as a U.S. Border Patrol Agent for approximately five years and a Federal Air Marshall for approximately five years; having begun my federal law enforcement career in February 1998. While performing my duties as a Special Agent, I have participated in various investigations involving computer-related offenses and have executed numerous search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information.  I have received both formal and informal training in the detection and investigation of computer-related offenses.  As part of my duties as a Special Agent, I investigate criminal child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A.

3.      As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

1

## II.     PURPOSE OF THE AFFIDAVIT

4.      The facts set forth below are based upon my own personal observations, investigative reports, and information provided to me by other law enforcement agents.  I have not included in this affidavit all information known by me relating to the investigation.  I have set forth only the facts necessary to establish probable for a gray Apple iPhone 11 (the SUBJECT DEVICE) that was seized from the persons of Ralph Aldridge at the time of his arrests by federal agents.[1]  I have not withheld any evidence or information that would negate probable cause.

5.      The SUBJECT DEVICE to be searched is more particularly described in Attachment A, for the items specified in Attachment B, which items constitute instrumentalities, fruits, and evidence of violations of 18 U.S.C. §§ 1591(d), 1594(c), 2232, and 1001(a)(2), conspiracy to obstruct a child sex trafficking investigation; destruction or removal of property to prevent seizure; and making a false statement to law enforcement; and 21 U.S.C. §§ 841 and 846 -- possession with intent to distribute a controlled substance and conspiracy to possess with intent to distribute a controlled substance.  I am requesting authority to search the SUBJECT DEVICE, wherein the items specified in Attachment B may be found, and to seize all items listed in Attachment B as instrumentalities, fruits, and evidence of crime.

## III.     APPLICABLE STATUTES AND DEFINITIONS

6.      Title 18, United States Code, Section 1591 makes it a federal crime for any person, in or affecting interstate or foreign commerce to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize or solicit, by any means, a person, knowing, or in reckless disregard of the fact that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act.  Subsection (d) of this section makes it a federal crime to obstruct, attempt to obstruct, or in any way interfere with or prevent the enforcement of Section 1591.  Section 1594 of the same title prohibits attempts or conspiracies to engage in such acts.

---

[1] Because no examination of the SUBJECT DEVICE has been conducted, your affiant has not been able to obtain a serial number or other identifying number for the SUBJECT DEVICE.  Apple devices do not contain any identifying information on the outside of the devices, and without a passcode to access the device no identifying information is available.  Aldridge did not provide the passcode to the SUBJECT DEVICE at the time that he was arrested and the SUBJECT DEVICE was seized.

2

7.      Title 18, United States Code, Section 2232(a) makes it a federal crime for any person, before, during or after an authorized government search for or seizure of property, to knowingly destroy, damage, waste, dispose of, transfer, or take any other action, or attempt to do so, for the purpose of preventing the government from lawfully taking such property into its custody or control.

8.      Title 18, United States Code, Section 1001(a)(2) makes it a federal crime to knowingly make a materially false, fictitious or fraudulent statement or representation in a matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States.

9.      Title 21, United States Code, Section 846, makes it a federal crime for any person to attempt or conspire to commit any offense defined within the subsection, which in the case of this investigation is Title 21, United States Code, Section 841(a)(1), making it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

13.     The term "computer"[2] is defined in Title 18 U.S.C. § 1030(e)(1) as an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

14.     As it is used throughout this affidavit and all attachments hereto, the term "storage media" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

15.     Pursuant to Title 18, United States Code, Section 1591(e)(3) the term "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person.

---

[2] The term "computer" is used throughout this affidavit to refer not only to traditional laptop and desktop computers, but also to internet-capable devices such as cellular phones and tablets.  Where the capabilities of these devices differ from that of a traditional computer, they are discussed separately and distinctly.

3

VI.     **INVESTIGATION AND PROBABLE CAUSE**

16.     In approximately April of 2019, the FBI began investigating Larry Dean Porter.
The investigation was initiated due to reports from several sources in the Portsmouth and South
Webster areas who indicated that Porter was sexually abusing minors, and that such abuse was
occurring with the consent of the minors' parents, who were receiving illegal controlled
substances from Porter. Some of those sources provided names of specific children that they
believed were being abused. After conducting several interviews, the investigation stalled
because additional witnesses could not be interviewed without risking that Porter would learn of
the investigation.

17.     In March of 2020, the investigation into Porter's illegal activities was revived
through information obtained from the Jackson County Sheriff's Office (JCSO). JCSO detectives
were approached by a Confidential Human Source (CHS1), who stated that s/he had information
pertaining to Porter's involvement in human trafficking. CHS1 informed the detectives that
Porter had contacted CHS1 via telephone in approximately 2013, and offered to provide CHS1
with narcotic pills in exchange for allowing Porter to "babysit" his/her significant other's 2-year-
old child. CHS1 explained that Porter used the term "babysit" to refer to the time he spent with
children during which he sexually abused them. Since approximately January 2020 and on
numerous occasions, CHS1 has provided reliable information to law enforcement regarding
potential criminal activity of others.

18.     Beginning on March 9, 2020, CHS1 engaged in a controlled Facebook Messenger
conversation with Porter at the direction of JCSO detectives, regarding plans to meet with a
seven-year-old girl in exchange for $80 in cash. Your affiant observed screen captures of the
Messenger communications between CHS1 and Porter obtained from CHS1's Facebook
Messenger account. During the course of those conversations, CHS1 reminded Porter about their
prior conversation concerning babysitting and informed Porter that a friend of ▮▮▮ was strung out
on drugs and looking to sell her seven-year-old daughter for drug money. After back and forth
conversation regarding Porter's concerns about being set up and when and where to meet, CHS1
told Porter that ▮▮ could keep the child with ▮▮ for a while, and that the child's mother was
"strung out on h bad," then sent a picture of the child, after which ▮▮ and Porter negotiated a
price of $80 that Porter would pay to CHS1 for access to the child. A time and place was

4

established for the sexual encounter, and Porter arrived at the specified time and location in Oak Hill, Ohio, on March 10, 2020. After a brief conversation about the child with CHS1, Porter was arrested by JCSO detectives. At the time of his arrest, he was found to have $80 on his person, and a cellular phone was recovered from his vehicle. Subsequent forensic examination of the cellular phone revealed videos depicting Porter engaged in sexual activity with later-identified adult females.

19.     Porter was interviewed subsequent to his arrest, and admitted to communicating with CHS1 but claimed that he only agreed to meet with the CHS1 to make sure the 7-year-old girl wasn't hungry. Porter identified his Facebook account username and provided consent to search both his residence and any computers or storage media that were found in that residence.

20.     Based on the foregoing, on Wednesday, March 11, 2020, FBI agents and deputies from the JCSO and Scioto County Sheriff's Office (SCSO), went to Porter's residence in Wheelersburg, Ohio, and recovered numerous computers, hard drives and other digital devices from throughout the residence. Officers also noticed a very strong odor of marijuana, although only a very small amount of a leafy green substance appearing to be marijuana was found.

21.     On March 16, 2020, Porter was indicted in the Jackson County Court of Common Pleas on one count each of Attempted Rape and Involuntary Servitude, in violation of Ohio Revised Code sections 2905.32(A)(2) and 2923.02(A). He remained in custody in the Jackson County jail from the time of his initial arrest on March 10, 2020, until he was taken into federal custody on May 27, 2020, where he has remained since.

22.     Subsequent to Porter's arrest on March 10, 2020, your affiant and other federal and local law enforcement officers conducted numerous interviews and executed numerous search warrants. During the course of the investigations both prior to and subsequent to Porter's arrest, your affiant identified and/or interviewed five confidential sources (CHS1 through CHS5); five individuals who had sold children to Porter for drugs or engaged in sex acts with children at Porter's direction in exchange for drugs (SUSPECTS #1-3, Charity Rawlins, and Ronnie Rawlins); and at least seven victims who had been sexually abused by Porter when they were minors, five of whom were sold to Porter in exchange for drugs (VICTIM 1 through VICTIM 7). As a result of the information obtained from these sources and evidence obtained from search warrants executed at numerous residences and for the content of numerous Facebook accounts, on May 27, 2020, Larry Dean Porter, Crystal Porter, Denna Porter, Dave Cole, Frank Andrews, and

5

Erroll Wayne Porter, Sr. were arrested on federal criminal complaints charging the defendants with crimes related to child sex trafficking, production and possession of child pornography, obstructing a child sex trafficking investigation, witness tampering, and conspiracies or attempts to commit the foregoing crimes.  Charity and Ronnie Rawlins were also subsequently arrested on child sex trafficking charges.  All of the previously arrested individuals, as well as Joshua Aldridge, were indicted by the Grand Jury for the Southern District of Ohio on June 23, 2020.  Amongst other offenses, the defendants were charged with engaging in a sex trafficking conspiracy, substantive sex trafficking offenses, conspiracy to obstruct the enforcement of the sex trafficking statute, 18 U.S.C. § 1591(a), witness tampering, and making false statements to federal officers.

   23. ALDRIDGE is related to four of the individuals indicted on June 23, 2020.  He is married to Crystal Porter, Larry Dean Porter's daughter, and is thus the son-in-law of Larry Dean Porter and the brother-in-law of Denna Porter, Crystal's sister.  ALDRIDGE resides with Crystal and was present at their shared residence when a search warrant was executed there on March 24, 2020.  The Grand Jury has charged Crystal and Denna with conspiring to obstruct the enforcement of 18 U.S.C. § 1591(a), in violation of 18 U.S.C. §§ 1591(d) and 1594(c); making a false statement to federal officers, in violation of 18 U.S.C. § 1001; and destruction or removal of property to prevent seizure, in violation of 18 U.S.C. § 2232(a) and 2.  ALDRIDGE is also the brother to Joshua Aldridge, who has been indicted on charges of child sex trafficking and a child sex trafficking conspiracy, in violation of 18 U.S.C. §§ 1591(a) and (b) and 1594(a) and (c).

   24. The charges against Denna and Crystal relate to their activities at Larry Dean Porter's residence subsequent to Porter's arrest and their statements to law enforcement during the execution of search warrants at their residences.  Specifically, CHS3 and CHS4 provided information to law enforcement that during the week subsequent to Porter's arrest in March, Denna, Crystal, Dave Cole, and Frank Andrews were seen removing items from Porter's residence.  On one of the days that these individuals were seen at the residence, they were also observed digging in the yard surrounding Porter's residence.  Based on the activities reported by CHS3 and CHS4, on March 20, 2020, agents obtained and executed a search warrant at Porter's residence in order to locate any additional evidence that had not been found during the consensual search.  The search of the property surrounding Porter's residence revealed a 2GB SD memory card that was within a sealed glass jar buried in the yard.  The jar was found in the same area

6

where CHS3 indicated Denna and Crystal Porter had been digging. Forensic examination of the SD card revealed the presence of three images depicting an adult female sexually assaulting a prepubescent female child. The background of the images clearly show that they were taken inside the bedroom of Porter's residence. Upon review by SCSO detectives, the identity of both the adult and minor females depicted in the photos was confirmed to be SUSPECT #1 and VICTIM 3, both of whom were subsequently interviewed and confirmed that Porter gave SUSPECT #1 and SUSPECT #2 controlled substances in exchange for allowing Porter to sexually abuse VICTIM 3 and VICTIM 4 or to watch as SUSPECT #1 sexually abused VICTIM 3.

25. In light of the evidence found on the buried SD card, the activities that were reported to have taken place at Porter's residence prior to the execution of the search warrant on March 20, 2020, and statements from numerous witnesses and sources indicating that Porter had created child pornography of numerous other victims, your affiant had reason to believe that other digital devices were taken from Porter's residence sometime prior to law enforcement searches. Law enforcement thus obtained and executed search warrants at four locations: the residences of Denna and Crystal Porter, Andrews and Cole.

26. ALDRIDGE was present at the residence he shared with Crystal when the search warrant was executed there on March 24, 2020. He was interviewed at the time, and admitted that he had been at Porter's residence with Crystal the weekend after Porter's arrest and that he had assisted in digging in Porter's yard. According to ALDRIDGE, they were digging for money they believed Porter had buried in the yard. ALDRIDGE further denied any knowledge of any computers, hard drives, or any other computer-related media being found or taken from Porter's residence by him, Crystal, or Denna. According to both Crystal and ALDRIDGE, all they took from Porter's residence were family photos, old clothing items, and other general belongings.

27. During the execution of the search warrants on March 24, 2020, agents seized numerous digital devices, including cellular phones belonging to Crystal, Denna, Andrews and Cole. The forensic examination of some of those devices is still ongoing. However, to date agents have determined that eight DVDs seized from Andrews' residence contained child pornography, and forensic evidence indicates those discs had previously been inserted into a computer seized from Porter's residence. Additionally, Facebook communications between Denna and Crystal, and between Crystal and another identified associate of Porter, all of which were located during the examination of Denna and Crystal's phones, indicate that they were all

aware that digital devices, specifically SD cards, were being searched for at Porter's residence. The communications also indicate that they believed that CHS 3 was responsible for Porter's arrest.

28.     In addition to the search warrants executed at the residences, your affiant has also served search warrants on Facebook for the content of the accounts belonging to Porter, Denna and Crystal, amongst others. The communications provided by Facebook further confirms that Denna and Crystal took digital devices from Porter's residence. Information recently learned by your affiant confirms that ALDRIDGE was also aware of this fact and that he shared Denna and Crystal's belief that CHS 3 was responsible for Porter's arrest.

29.     In a Facebook communication on March 12, 2020, between Crystal and Porter's identified associate, the associate told Crystal ▮ had just discussed everything ▮ knew about Porter with Denna. The associate indicated that ▮ believed that SUSPECT #2 was responsible for Porter's arrest. ▮ then told Crystal that ▮ had just left Porter's residence, and that Denna, Frank, Dave, and another identified individual were packing things there. When Crystal asked what they were packing, the associate stated "SD memory cards for vphones or cameras." In subsequent days, Crystal and Denna communicated about what the associate knew about Porter, but agreed that they could not discuss any specifics over Facebook. During that same time period, Crystal had another conversation with the associate about who was responsible for Porter's arrest. During that conversation, Crystal stated "And [CHS#3 and ▮ and possibly one other person I feel."

30.     In another Facebook conversation on March 12, 2020, Crystal and Denna further discussed CHS3. Crystal stated to Denna, "I believe its awful funny [CHS3] was in jail and now dad is. I don't trust ▮ at all." Denna replied, "Yeah non of us do." Crystal then stated, "▮'s involved I'm telling ya." When Denna concurred, Crystal continued, "Every since [CHS3] told me the school was making a case against dad to keep his kids away from him I knew right then."

31.     Subsequent information indicates that Crystal and Denna continued to discuss how to prevent law enforcement from obtaining further evidence of Porter's crimes after search warrants were executed at their residences. In order to follow up on information Denna provided at the time the search warrant was executed at her residence, your affiant and another agent went to Denna's residence on May 5, 2020. During that interview, Denna informed agents that when she was at Porter's residence on or about March 12, 2020, Dave Cole had given her a black coffee

8

container that contained various digital devices. Denna consented to agents taking the coffee container, which was found to contain numerous RAM drives and an 8GB SD card.

32. A forensic examination of the SD card revealed a file that was created when the card was connected to a Windows-operating system to view the contents of the card. That file was created on March 17, 2020, at approximately 1:49 PM, showing that the card was connected to a computer using a Windows operating system at that date and time. The card also contained approximately four child pornography video titles that had been deleted in 2018. However, your affiant was able to recover and view one of the videos and confirmed that it depicted child pornography. A forensic examination of Denna's cellular telephone, revealed the following March 17, 2020, conversation that occurred between Denna and Crystal between approximately 6:41 PM and 6:43 PM over Facebook messenger:

- Denna: Nothing on that
- Crystal: ?
- Denna: From earlier
- Denna: Nothing on it
- Denna: Just regular stuff
- Crystal: Oh
- Crystal: Damn
- Crystal: Would been nice if it was lol

33. Your affiant believes this conversation was about the SD card that agents discovered in Denna's possession on May 5, 2020, that Denna accessed the SD card on March 17, 2020 to verify if the SD card contained evidence of Larry Dean Porter's sexual activity with children, and that Denna shared her findings about the SD card with Crystal on the same day. Your affiant believes Crystal was displaying her disappointment that the SD card did not contain the evidence they were looking for.

34. Subsequent to the return of the indictment in which Denna and Crystal were charged with various obstruction-related offenses, an FBI Tipline was established in order for members of the public to report any knowledge or information regarding any additional victims who had been abused by Porter. One call to the Tipline related to ALDRIDGE and his activities relating to the obstruction of the investigation into Porter. Your affiant contacted that individual, CHS8, and interviewed ▇ on June 30, 2020. CHS8 informed your affiant that ▇ met ALDRIDGE in 2019. ALDRIDGE talked about making drug trips to Portsmouth. In the same

9

context, ALDRIDGE would talk about traveling to Portsmouth to his father-in-law's house, Porter's residence. CHS 8 knows ALDRIDGE to be a marijuana dealer, and that ALDRIDGE had also mentioned selling heroin. CHS 8 said ▮ was not aware if ALDRIDGE was involved with pills, but that ALDRIDGE seemed to travel to Portsmouth at least one time per month and he would typically provide Porter with a pound of marijuana. ALDRIDGE bragged about bringing pounds of marijuana between Columbus and Portsmouth.

35.    CHS8 also discussed ALDRIDGE's activities and statements since Crystal and Porter's arrests, indicating that ALDRIDGE frequently talked to CHS8 and other mutual associates about the investigation. CHS8 had discussed ALDRIDGE's statements with the other associates, and had learned that one of those associates had used his phone to audio and video record a conversation the associate had with ALDRIDGE. The associate sent the recording to CHS8, and CHS8 provided the recording to your affiant, as the associate was afraid to speak with law enforcement.

36.    In the video recording CHS8 provided, ALDRIDGE discussed travelling to a court hearing that was eventually canceled, which your affiant believes was on or about Friday, March 13, 2020, when Porter was scheduled to have a hearing in Jackson County. ALDRIDGE indicated that prior to Denna and Crystal's return from the courthouse, ALDRIDGE was seated in the car smoking a cigarette with Andrews. While they were waiting in the car, ALDRIDGE asked Andrews if it was true that Andrews was there when Porter was trying to arrange to meet with and buy a seven year old. Andrews replied it was true. ALDRIDGE said he subsequently told Crystal that, based on his conversation with Andrews, everything they said on the internet was true, referring to the allegations against Porter. ALDRIDGE went on to state that later on the same day as the court hearing, he, Denna, Crystal, Frank, Cole, Wayne, a named male, and an unidentified female went with Denna to Porter's house at Denna's request. During this visit, according to ALDRIDGE, CHS3 allegedly approached "them" and indicated "something" was buried in the strawberry patch.

37.    ALDRIDGE's recorded statement to the associate and records your affiant has reviewed from JCSO, confirmed that a jail visit was conducted at the Jackson County Jail, on or about Saturday, March 14, 2020 with Porter. Crystal, Denna and Cole were among the visitors. In the video provided by CHS8, ALDRIDGE stated that after they visited with Porter at the jail and while at Porter's house, Denna told them "he" said there was money there and they needed to

10

go get it to get him out of jail. Denna said they only needed 10%, and that was when ALDRIDGE began digging in Porter's strawberry patch. ALDRIDGE said CHS3 was also there that day and was giving them various locations where Porter may hide things. Later, when ALDRIDGE and CHS3 were alone in the yard, CHS3 claimed to ALDRIDGE there was a SD card in a Mason jar buried in the strawberry patch. CHS3 and ALDRIDGE discussed digging in the yard, and to say they were only there looking for money, because ALDRIDGE didn't want law enforcement to think they were there planting evidence. On the same day, ALDRIDGE said he told Denna and Crystal they should stick to their story and that they were only looking for money.

38.     Also in the recorded statement, ALDRIDGE stated that Denna took an SD card from Porter's desk when she was at the residence on the Monday after Porter's court in mid-March. ALDRIDGE said he warned Denna that she should not look at what was on it after learning that law enforcement had warrants for items such as SD cards. ALDRIDGE claimed he told Denna she should give the SD card to law enforcement, because she could get into trouble if there was anything on the SD card. ALDRIDGE said she would give the SD card to law enforcement if she found anything on the SD card, but she later texted Crystal that the SD card was blank. ALDRIDGE said they later found out that something was deleted from the SD card in 2018, after reading the documentation leading to Crystal's arrest.

39.     In addition to providing the video obtained from the associate, CHS8 also informed your affiant about ███ own recent interactions with ALDRIDGE. CHS8 reported that ALDRIDGE approached ███ knowing CHS8 was an avid outdoorsman and requested CHS8 take ALDRIDGE's phone when CHS8 went on a fishing trip, so the FBI could not determine ALDRIDGE's location. CHS8 was also aware of ALDRIDGE making a similar request of another associate, asking the associate to take ALDRIDGE's phone to a poker game while ALDRIDGE went down south to take care of business. CHS8 believed that the business that ALDRIDGE planned to take care of was killing CHS3, because ALDRIDGE had repeatedly made statements to CHS8 and others that he wanted CHS3 dead. CHS8 estimated Ralph approached       and the other associate in early June 2020, approximately a day or two after Crystal was released following her arrest.

40.     CHS8 provided your affiant's contact information to the other associate, CHS9, with whom your affiant spoke via phone on June 30, 2020. CHS9 confirmed that ALDRIDGE

11

had approached ▮ a couple weeks prior and asked CHS9 to hold his phone while ALDRIDGE went down south to take care of some business. ALDRIDGE also mentioned that he planned to obtain a revolver in order to take care of that business. Based on prior statements CHS9 had heard ALDRIDGE make in regards to the investigation of Porter, it was CHS9's belief that ALDRIDGE intended to harm someone related to that investigation.

41.     Between May 27, 2020, and June 2, 2020, your affiant reviewed recorded jail calls between Crystal and ALDRIDGE, after Crystal's initial arrest. During those calls ALDRIDGE indicated he was part of Porter's drug trafficking conspiracy. For instance, ALDRIDGE said, "The only thing they can get you is when you told them you didn't know he sold pills. You didn't. You've never been in that part. I'm the one that knew it." ALDRIDGE continued, "I know more than she knows about her dad in this situation, yea drug wise. That's what I'm saying, I know more about your dad than you did. He never brought you guys in on that….now me yes because I was a drug dealer when I met him, that's the only reason." Crystal tried to clarify for ALDRIDGE, "you were a drug addict when you met me." ALDRIDGE replied, "that too but I mean I sold a lot of shit too, but that was the only reason." ALDRIDGE then went on to discuss his guilt that he was not in prison instead of Crystal saying, "I feel guilty I should be the one in there not you." Crystal again tried to clarify for ALDRIDGE, "you didn't do anything Ralph." ALDRIDGE replied, "I know but I was the one the dug the hole, not you." Crystal then went on to justify their reasons for digging in the yard. Crystal said, "there wasn't nothing there though. We were looking for money that's the whole reason why we pawned the damn bike off to Wayne." ALDRIDGE again tried to take the blame for their actions saying, "you wasn't even outside, you was in the house. Why are you being arrested for it?" ALDRIDGE then went on to say, "and Denna was out there." Crystal clarified, "I was out there watching." ALDRIDGE responded, "for a minute but you were mostly in the house."

42.     On or about July 1, 2020, ALDRIDGE was arrested on a federal criminal complaint charging him with conspiring to obstruct the enforcement of 18 U.S.C. §1591(a), in violation of 18 U.S.C. §§ 1591(d) and 1594(c). At the time of his arrest, the SUBJECT DEVICE was recovered from his person and seized to preserve evidence. The SUBJECT DEVICE has remained in secure evidence storage at the FBI 425 W. Nationwide, Columbus, Ohio 43215 since the time that it was seized. No examination of the contents of the device has been conducted by any law enforcement authority. In my training and experience, I know that the SUBJECT

12

DEVICE has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT DEVICE first came into the possession of the FBI.

## IV.    TECHNICAL TERMS

45.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

13

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is generally a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every device that connects to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static— that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

14

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

46.    Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.apple.com/iphone-11/, I know that the SUBJECT DEVICE has the following capabilities: wireless telephone; digital camera/ video recorder; portable media player; GPS navigation device; Bluetooth; USB connection; external memory storage; and internal memory storage.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and who communicated with the user of the device.

## V.  ELECTRONIC STORAGE AND FORENSIC ANALYSIS

47.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

48.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.

15

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to communicate about criminal activity, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how and when the electronic device was used; data that was sent or received to or from another electronic device user; and other records that indicate the nature of the offense.

49. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but

16

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

50.     Due to the SUBJECT DEVICE being locked and your affiant not having the passcode to unlock the SUBJECT DEVICE, certain search methodologies may be necessary to access the data contained on the SUBJECT DEVICE. Some of these methods and forensic tools are able to bypass password/passcode locks, decode such passwords, or otherwise obtaining raw data from the memory chip of a device. Some of these methods may render a device inoperable for any future examination or use. In order to utilize some of these forensic tools, your affiant may need to transport the SUBJECT DEVICE to another law enforcement agency that, including the Ohio Bureau of Criminal Investigation ("BCI") or the Columbus Police Department.

51.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## VII.    CONCLUSION

52.   Based on all the forgoing factual information, including the communications obtained from the cellular phones and Facebook accounts of Crystal and Denna Porter, the recorded jail calls between Crystal Porter and ALDRIDGE, and ALDRIDGE's statements to CHS8 and CHS9, your affiant believes that ALDRIDGE was involved with obstructing, conspiring to obstruct and attempting to obstruct the enforcement of the investigation of Larry Dean Porter's drug and sex trafficking activities. Your affiant further has reason to believe that evidence of ALDRIDGE's obstructive acts, in the form of communications with others about the investigation of Porter and steps taken to thwart that investigation, will be found on ALDRIDGE's cellular phone. Thus you affiant submits that there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1591, 1001(a) and 2232(a) will be found within the content stored on the SUBJECT DEVICE. Your affiant therefore respectfully requests that the Court issue a search warrant authorizing the search of the SUBJECT DEVICE described in Attachment A, and the seizure of the items described in Attachment B.

53.   Because the SUBJECT DEVICE is currently in the possession of law enforcement agencies and will be forensically examined within law enforcement offices by a law enforcement

officer at a time convenient to the law enforcement officer, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Michael A. Harey
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this ⸻20⸻ day of July, 2020.

Chelsey M. Vascura
United States Magistrate Judge
United States District Court, Southern District of Ohio

18

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The device to be searched is:

(1) Gray Apple iPhone 11

The item described above were seized from the person of Ralph Albert Aldridge, pursuant to his arrest and is currently being held at the Columbus FBI Office secure evidence storage location at 425 W. Nationwide, Columbus, Ohio 43215.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

19

## ATTACHMENT B
## PROPERTY TO BE SEIZED

The following materials which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 1591, 2232, and 1001, and Title 21, United States Code, Sections 841 and 846.

1. Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or online storage or chat programs), utilities, compilers, interpreters, and communications programs.

2. Any and all communications, in any format or medium (including, but not limited to, text messages, e-mail messages, chat logs, social media communications and electronic messages), relating to the acquisition of illegal drugs and/or the law enforcement investigations of Larry Dean Porter and any of his co-conspirators involved in his child sex trafficking, child pornography, and drug trafficking activities.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, text messages, e-mail messages, chat logs, social media communications and electronic messages,) pertaining to the law enforcement investigations of Larry Dean Porter and any of his co-conspirators involved in his child sex trafficking, child pornography, and drug trafficking activities.

4. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to e-mail messages, chat logs, electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider or Electronic Communications Service.

5. Any and all files, documents, records, or correspondence, in any format or medium (including, but not limited to, network, system, security, and user logs, databases, software registrations, data and meta data), that concern user attribution information.

6. Any and all visual depictions of minors, whether clothed or not, for comparison to any child pornography or child erotica obtained during the course of this investigation.

7. All items found on the device described in Attachment A that relate to violations of 21 U.S.C. §§ 841 including:

20

a. Any and all log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers relating to the transportation, ordering, purchasing, processing, storage, and distribution of controlled substances, as well as all records of assets, liabilities, income and expenses;

b. Any and all books, records, invoices, receipts, records of real estate transactions, financial statements, bank statements, canceled checks, deposit tickets, passbooks, money drafts, withdraw slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money;